IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| SIERRA CLUB AND SOUTH CAROLINA WILDLIFE FEDERATION, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ELIZABETH VON KOLNITZ, in her official capacity as Chief of the Office of Coastal Resource Management of South Carolina Department of Health and Environmental control, CATHERINE HEIGEL, in her official capacity as the Director of South Carolina Department of Health and Environmental Control, and SOUTH CAROLINA DEPARTMENT OF HEALTH AND ENVIRONMENTAL CONTROL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 2:16-cv-03815-DCN  ORDER |
| Defendants. | ) ) | |

This matter is before the court on plaintiffs Sierra Club and South Carolina Wildlife Federation's (collectively, "plaintiffs") motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure as well as defendants Elizabeth Von Kolnitz, in her official capacity as Chief of the Office of Coastal Resource Management of the South Carolina Department of Health and Environmental Control ("OCRM"), Catherine Heigel,[1] in her official capacity as the Director of the South Carolina Department of Health and Environmental Control, and the South Carolina Department of Health and Environmental Control's (collectively, "DHEC") motion to

---

[1] Director Heigel has resigned from DHEC effective August 4, 2017. David E. Wilson is the Acting Director of DHEC.

1

dismiss. For the reasons set forth below, the court denies DHEC's motion to dismiss and grants plaintiffs' motion for preliminary injunction.

## I. BACKGROUND

This case arises out of the use of wave dissipation devices ("sea walls") in Isle of Palms and Harbor Island, South Carolina. Under the South Carolina Coastal Zone Management Act ("CZMA"), the construction of any new erosion control structures or devices on the beach is prohibited. S.C. Code § 48-39290(B)(2)(a). The sea walls were authorized by the South Carolina General Assembly under the budget proviso to the 2014–15 and 2015–16 budgets, and fall under the "research activity" exception to the CZMA which allows for research activity to be conducted on beaches without first obtaining a DHEC permit. S.C. Code § 48-39290(D)(2). The sea walls, which consist of vertical plastic pylons drilled into the sand and horizontal plastic bars stacked within the pylons, were installed on an experimental basis under the auspices of the budget proviso and authorized to remain in place for a period of one year. DHEC installed the temporary sea walls on certain beaches in Harbor Island and Isle of Palms in 2015, as part of a research project conducted by the Citadel.

Two public interest environmental organizations, the South Carolina Wildlife Federation and the Sierra Club, filed this action challenging the sea walls as a violation of the Endangered Species Act, 16 U.S.C. §§ 1531, <u>et seq.</u> ("ESA"), alleging that the sea walls interfered with the breeding patterns of various species of sea turtles that are listed as endangered under the ESA. South Carolina is home to the following marine turtle species: the Loggerhead sea turtle (caretta caretta), the Kemp's Ridleys sea turtle

(Lepidochelys kempis); the Green sea turtle (Chelonia mydas); and the Leatherback sea turtle (Dermochelys coriacea) (collectively, "sea turtles"). All of these species of turtles are listed as either endangered or threatened under the ESA.

An "endangered species" is one that is "in danger of extinction throughout all or a significant portion of its range." 16 U.S.C. § 1532(6). A "threatened species" is one that is "likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." 16 U.S.C. § 1532(20). Under the ESA, it is unlawful for any "person" to "take" endangered or threatened species. 16 U.S.C. § 1538(a)(1)(B) (the "take" prohibition); 50 C.F.R. § 17.31(a). It is equally unlawful for any "person" "to attempt to commit, solicit another to commit, or cause to be committed" a "take." 16 U.S.C. § 1538(g). Defined broadly, "take" means "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect[.]" 16 U.S.C. § 1532(19). "Harm" is defined in the regulations as "an act which actually kills or injures wildlife" and includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3. "Harass" is defined as "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering." 50 C.F.R. § 17.3. The ESA defines "person" to include "an individual, corporation . . . any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State," and "any State, municipality, or political subdivision of a State." 16 U.S.C. § 1532(13).

Plaintiffs argue that the sea walls interfere with sea turtle nesting activities, causing a "take" of sea turtles under the ESA. Sea turtles spend much of their lives in the ocean, with the exception of nesting—when female sea turtles crawl out of the ocean and onto the beach to dig a nest and lay eggs—and hatching—when sea turtle hatchlings crawl back into the sea. The sea turtles in question nest along sections of beaches in Isle of Palms and Harbor Island, and plaintiffs allege that the sea walls interfere with their nesting season because the sea turtles are physically blocked by the sea walls as they attempt to crawl onto the beaches to nest, a practice known as "false crawls." The sea turtle nesting season in South Carolina is from the beginning of May through late August.

On December 6, 2016, plaintiffs filed this suit, seeking an injunction requiring the removal of existing sea walls and prohibiting DHEC from authorizing the placement of sea walls in the future, declaratory relief that the sea walls violate the ESA and that any devices that block turtle access to the dry sand beach must be built under an incidental take permit from the United States Fish and Wildlife Service ("FWS"), as well as fees and costs. On January 30, 2017, DHEC filed a motion to dismiss. Plaintiffs responded on February 23, 2017. DHEC replied on March 16, 2017. On July 21, 2017, plaintiffs filed a motion for preliminary injunction requiring the immediate removal of all temporary sea walls from the two beaches where they have been constructed and for the sea walls to remain fully removed from the beach during all periods of potential sea turtle nesting that occur during the pendency of this case. DHEC filed a response to the motion for preliminary injunction on August 4, 2017. Plaintiffs replied on August 9, 2017. The court held a hearing on these motions on August 11, 2017. The motion to dismiss and the

motion for preliminary injunction have been fully briefed and are now ripe for the court's review.

## II. STANDARD

### A. Motion to Dismiss

A Rule 12(b)(6) motion for failure to state a claim upon which relief can be granted "challenges the legal sufficiency of a complaint." Francis v. Giacomelli, 588 F.3d 186, 192 (4th Cir. 2009) (citations omitted); see also Republican Party of N.C. v. Martin, 980 F.2d 943, 952 (4th Cir. 1992) ("A motion to dismiss under Rule 12(b)(6) [] does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses."). To be legally sufficient, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).

A Rule 12(b)(6) motion should not be granted unless it appears certain that the plaintiff can prove no set of facts that would support his claim and would entitle him to relief. Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). When considering a Rule 12(b)(6) motion, the court should accept as true all well-pleaded allegations and should view the complaint in a light most favorable to the plaintiff. Ostrzenski v. Seigel, 177 F.3d 245, 251 (4th Cir. 1999). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

### B. Preliminary Injunction

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." United States v. South Carolina, 840 F. Supp. 2d 898, 914 (D.S.C. 2011) (quoting Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 20 (2008). As the Supreme Court has noted, a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Id. at 22.

### III. DISCUSSION

This matter is before the court on two motions. DHEC seek to dismiss the case, citing Burford abstention. Plaintiffs seeks preliminary injunctive relief pursuant to Federal Rule of Civil Procedure 65 to require DHEC to remove the sea walls. The court addresses the motion to dismiss first, and then turns to plaintiffs' motion for preliminary injunction.[2]

---

[2] Five parties—Ocean Club Horizontal Property Regime, Carole Slotchiver, Kathryn V. Balazs, Paul Conway, and Seascape Villas Horizontal Property Regime—filed motions to intervene on August 9, 2017. Plaintiffs have not yet had the opportunity to respond. The court will issue an order on these motions to intervene once the matter has been fully briefed.

### A. Motion to Dismiss

DHEC seeks to dismiss the case under the Burford abstention doctrine, arguing that the court should dismiss the case in light of the pending state administrative actions in this matter. In the alternative, DHEC seeks a stay of the federal case until the state matters conclude. This motion is denied in full.

In Burford v. Sun Oil Co., 319 U.S. 315 (1943), the Supreme Court held that a federal court sitting in diversity jurisdiction may abstain from hearing a case where (1) the state courts likely have greater expertise in a particularly complex and unclear area of state law which is of special significance to the state, (2) there is a comprehensive state administrative or regulatory procedure, and (3) the federal issues cannot be decided without delving into state law. Burford abstention is permissible when federal adjudication would "unduly intrude" upon "complex state administrative processes" because either: (1) "there are difficult questions of state law whose importance transcends the result in the case then at bar"; or (2) federal review would disrupt "state efforts to establish a coherent policy with respect to a matter of substantial public concern." New Orleans Pub. Serv. Inc. v. Council of New Orleans, 491 U.S. 350, 361–63 (1989).

The court finds DHEC's abstention argument unavailing. Federal courts usually utilize Burford abstention when they sit in diversity jurisdiction to hear challenges to state agency proceedings. For example, in Browning-Ferris, Inc. v. Baltimore Cty., Md., 774 F.2d 77 (4th Cir. 1985), the Fourth Circuit found that Burford abstention was appropriate in a challenge to a denial by state and county authorities of permits necessary to operate a sanitary landfill. However, this case is before the court on a discrete federal question—if DHEC's authorization of the sea walls leads to the "take" of the sea turtles

under the ESA. In rendering a decision on this matter, the court does not engage in complex issues of state law or weigh state policy decisions. It is undisputed that DHEC has not obtained an incidental take permit from FWS under 16 U.S.C. § 1539(a)(1)(B), which states that FWS "may permit, under such terms and conditions as [it] shall prescribe . . . any taking otherwise prohibited by section 1538(a)(1)(B) of [the ESA] if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." Therefore, if the court finds that the sea walls lead to a "take" of the sea turtles under the ESA, then DHEC has violated the ESA.

Certainly, protecting coastal real estate from sea level rise and extreme climate events such as hurricanes is an important state policy. But abstention is not required "merely because resolution of a federal question may result in the overturning of a state policy." Zablocki v. Redhail, 434 U.S. 374, 380 n. 5 (1978). DHEC's attempt to frame this matter as a land use question, an area of traditional local control, falls short—the wording of the ESA makes clear that the protection of federally listed species is a national concern. There is a reason why the ESA is often referred to as the statutory "pit bull" of environmental laws. See Zdravka Tzankova et. al., Can the ESA Address the Threats of Atmospheric Nitrogen Deposition? Insights from the Case of the Bay Checkerspot Butterfly, 35 Harv. Envtl. L. Rev. 433, 443 (2011) ("Indeed, hardly a discussion of the ESA goes by without mention of its status as the 'pit bull of environmental laws'"). The Supreme Court halted the construction of a nearly complete, immense dam because it would have led to the annihilation of a three-inch fish called the snail darter in Tennessee Valley Authority v. Hill, 437 U.S. 153, 184 (1978), stating that "the plain intent of Congress in enacting this statute was to halt and reverse the trend

toward species extinction, whatever the cost." If these temporary sea walls do indeed lead to a "take" of the ESA-listed sea turtles, then the expense of removing the walls is encompassed within the phrase "whatever the cost."

DHEC argues that the sea walls are permissible because any concerns about federal endangered species were already taken into account in this decision-making process by the relevant state and local agencies that authorized the sea walls. Not so. DHEC rests its abstention argument on <u>Sierra Club v. City of San Antonio</u>, 112 F.3d 789 (5th Cir. 1997), where the court found that <u>Burford</u> abstention precluded a federal suit challenging water withdrawals from an aquifer as violating the ESA by leading to the take of the endangered fountain darter, in part, because there was a comprehensive regulatory scheme in place to regulate the aquifer. However, the relevant statute in <u>Sierra Club</u> explicitly addressed the preservation of endangered species and required the governing local agency of the aquifer to "protect aquatic and wildlife habitat" and to "protect species that are <u>designated as threatened or endangered</u> under applicable federal or state law." <u>Id.</u> at 794 (emphasis added). In contrast, here, the sea walls were authorized under the 2014–15 and 2015–16 budget provisos that provides for the construction of erosion control structures on the beach under the narrow "research activity" exemption of the CZMA, S.C. Code § 48-39-10. The budget proviso states only that any sea walls which cause "material harm to the flora, fauna, physical or aesthetic resources" "may" be removed. ECF No. 16, Ex. C, Budget Proviso. There is no specific

9

reference in the budget proviso to "species that are designated as threatened or endangered" under federal law, making it distinguishable from the statute in Sierra Club.³

Now, it would not be unprecedented for the court to dismiss an ESA action under the Burford abstention doctrine. Indeed, there have been law review articles written about this exact dilemma. See Deborah A. Clarke, Sierra Club v. City of San Antonio: Stretching the Bounds of the Burford Abstention Doctrine, 11 Tul. Envtl. L.J. 117 (1997). But under the circumstances of this particular case, the court refuses to do so. Abstention is not a "license for free-form ad hoc judicial balancing of the totality of state and federal interests in a case." Martin v. Stewart, 499 F.3d 360, 364 (4th Cir. 2007). This "ad hoc" balancing between state and federal interests is exactly what DHEC is urging the court to do here. The district court is under an "unflagging obligation to exercise its jurisdiction." In re Mercury Constr. Corp., 656 F.2d 933, 943 (4th Cir. 1981). In a case such as this, which arises under a federal environmental statute and can be fully resolved by applying federal law, this obligation is especially strong.

### B. Preliminary Injunction

Having declined to dismiss the case, the court now turns to plaintiffs' motion for preliminary injunction, wherein plaintiffs ask the court to enter an injunction requiring the immediate removal of all temporary sea walls from the two beaches where they have

---

³ And indeed, it is not difficult to imagine a hypothetical to demonstrate how the wording of the budget proviso does not, in fact, incorporate the requirements of the ESA—the use of a sea wall could lead to the destruction of 20% of the sea turtle nests on a beach. Since 80% of the sea turtle nests on the beach remained, a case could be made that this does not qualify as "material harm" to the sea turtles under the budget proviso. However, under the ESA the destruction of even 1% of the sea turtle nests on a beach is as a "take." In other words, the sea walls could lead to an immaterial harm to flora and fauna, comporting to the requirements in the budget proviso, yet violate the ESA.

been constructed and for the sea walls to remain fully removed from the beach during all periods of potential sea turtle nesting that occur during the pendency of this case. A party seeking a preliminary injunction must demonstrate that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in absence of the injunction, (3) the balance of hardships tips in its favor, and (4) the injunction is in the public interest. Winter, 555 U.S. at 20. "To obtain a preliminary injunction under the Winter test, a movant must make a 'clear showing' of [the] four requirements." Alkebulanyahh v. Nettles, No. 10-2976, 2011 WL 2728453, at *3 (D.S.C. July 13, 2011). Of these factors, there is a particular focus on the first, that the party moving for an injunction must be able to succeed on the merits. Dewhurst v. Century Aluminum Co., 649 F.3d 287, 290 (4th Cir. 2011) ("Winter thus requires that a party seeking a preliminary injunction . . . must clearly show that it is likely to succeed on the merits." (internal quotation omitted)). The court considers below whether plaintiffs have satisfied each of the four Winter factors.[4] It finds that they have.[5]

---

[4] DHEC argues that this preliminary injunction should not be granted because certain necessary parties, including the Citadel and the property owners who have houses behind the sea walls, have not been joined to the action. ECF No. 20 at 6–8. If DHEC believed that these parties must be joined, it could have moved to have those parties joined under Rule 19 or to dismiss the case on the ground that those entities cannot be joined. In the seven months since the complaint was filed, DHEC has done neither of those things.

[5] Practically speaking, a mandatory injunction is a rare remedy. But the court would point out that these walls are by their very design temporary structures that have a research purpose. Indeed, under the CZMA, the construction of any new erosion control structures or devices on the beach are prohibited. S.C. Code § 48-39290(B)(2)(a). These sea walls were created as temporary erosion control structures through a budget proviso passed by the South Carolina General Assembly, and were installed on an experimental basis. If anything, this mandatory injunction simply serves as a judicially-mandated hiatus to that research activity.

1. **Likelihood of Success on Merits**

The court first finds that plaintiffs are likely to succeed on the merits of their ESA take claim. "Although [the likelihood-of-success] inquiry requires plaintiffs . . . to make a clear showing that they are likely to succeed at trial, plaintiffs need not show a certainty of success." Pashby v. Delia, 709 F.3d 307, 321 (4th Cir. 2013) (internal citations omitted). However, it is not enough for a plaintiff to provide only sufficient factual allegations to survive a Rule 12(b)(6) motion to dismiss. Torres Adv. Enterp. Solutions LLC v. Mid-Atl. Professionals, Inc., 2013 WL 531215, at *3 (D. Md. Feb. 8, 2013) (internal citations omitted).

The ESA defines the term "take" to include "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). In Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 704 (1995) (internal quotations omitted), the Supreme Court held:

> Congress intended "take" to apply broadly . . . The Senate Report stressed that "[t]ake is defined . . . in the broadest possible manner to include every conceivable way in which a person can take or attempt to take any fish or wildlife." The House Report stated that "the broadest possible terms" were used to define restrictions on takings.

The term "harm," as used in the definition of "take," is "an act which actually kills or injures wildlife. Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3 (emphasis added). A government official violates the ESA's "take" prohibition when that official authorizes someone to exact a taking of an endangered species, which, but for the authorization, could not have taken place.

12

Seattle Audubon v. Sutherland, 2007 WL 1300964, at *8 (W.D. Wash. May 1, 2007); see Strahan v. Coxe, 127 F.3d 155, 163 (1st Cir. 1997) (holding that the ESA prevents state officials from bringing about the acts of another party that leads to a taking). This is the framework that plaintiffs ask the court to apply here—that DHEC authorized the sea walls, even though they did not construct the walls themselves. Without DHEC's authorization of the sea walls, the walls would not have been constructed and the problem of sea turtles false crawls would not be occurring. All this is to say, if plaintiffs can prove that DHEC's actions in authorizing the sea walls led to a "significant impairment" in the sea turtles' breeding patterns, then they have demonstrated a likelihood of success in their ESA "take" claim. This is the standard that guides the court's analysis in this first factor of the preliminary injunction test.

Plaintiffs point to DHEC's own documents, where DHEC staff scientists have noted numerous occasions of the sea turtles attempting to nest on sections of the beach and being blocked by sea walls, to argue that the sea walls lead to a take of the sea turtles. DHEC has records of failed nesting attempts.[6] ECF No. 16,

---

[6] The DHEC staff report does note that there is no evidence that the false crawls at locations with sea walls results in an <u>actual</u> decrease in the total number of sea turtle nests on Harbor Island or Isle of Palms. ECF No. 16, Ex. G, Final DHEC Wave Dissipation System Report at 21. Instead, the DHEC report states that "[i]t can be debated whether . . . the turtle would not have laid her eggs regardless of the presence of the [sea walls], or if the [sea walls] interrupted a nesting attempt." Id. at 22. This statement in the DHEC report that the sea turtles would have engaged in false crawls even on portions of the beach without the sea walls is somewhat contradictory to the statement in the report that "the [sea walls] [do] present a potential harm associated with continued nesting attempts." Id. at 32. It certainly conflicts with plaintiffs' sea turtle expert Sally Murphy, who states that "with a high degree of scientific certainty [] the [sea walls] are <u>likely to</u>

Ex. G, Final DHEC Wave Dissipation System Report at 21 ("There have been false crawls caused by sea turtles encountering the [sea walls.] Evaluation of false crawl data along Harbor Island and [Isle of Palms] indicates that there was a higher rate of false crawls along the segments of shoreline with the [sea walls] than the remainder of the island."). Indeed, the DHEC section manager explained to the DHEC Board that "the [DHEC staff] stands by our recommendation" that the sea walls negatively affect sea turtles by harming the "continued nesting attempts" of female sea turtles, and that this finding was "confirmed by U.S. Fish and Wildlife Letter [that was] submitted February 9th." ECF No. 16, Ex. L, DHEC Board Hr'g Tr. at 17. In this letter, the FWS "determined that this is a take" because the sea walls "disrupt[ed] normal sea turtle nesting behavior." Id. at 18. Other agencies agree with this assessment. In an email, the Coastal Environmental Coordinator at the South Carolina Department of Natural Resources ("DNR") stated that "[the sea walls] pose a threat to nesting turtles and should not be allowed except for emergency situations where no nesting occurs," and reiterated that, "[a]s recommended in our original comments, we believe this permit . . . should be conditioned to require the removal of these structures when adverse impacts to turtles are documented." ECF No. 16, Ex. K, DNR False Crawl Photos. The FWS, the federal agency charged with enforcing the ESA, also agrees that the sea walls are blocking sea turtles from nesting. In emails, the deputy field supervisor of the South Carolina Field Office of the FWS sent photos

---

cause additional false crawls going forward, both in this nesting season and in future nesting seasons." ECF No. 16, Ex. I, Murphy Declaration ¶ 17 (emphasis added).

of false crawls that have occurred on multiple occasions during the nesting season with the message "[s]ea turtle blocked by the [sea walls] on Harbor Island." ECF No. 16, Ex. K, DNR False Crawl Photos.

The court also takes note of the opinions of plaintiffs' sea turtle expert, Sally Murphy ("Murphy"), who was the lead sea turtle scientist at DNR for 30 years and has authored dozens of peer-reviewed journal articles on sea turtles. In her affidavit, Murphy testifies that:

> false crawls use up previous energy needed for the production of the next clutch of eggs. The loss of energy from false crawl(s) can result in a female sea turtle producing fewer clutches of eggs than she otherwise would have. This lowers the reproductive potential by reducing the number of clutches laid in a season.

ECF No. 16, Ex. I, Murphy Declaration ¶ 8. According to Murphy, physical obstacles such as the sea walls lead to harm in several ways. For example, the female sea turtle may have to nest in less than optimal areas that will be "inundated by the tide," or deposit eggs in the ocean, which leads to a survival outlook of the baby sea turtles that is "slim to none."[7] Id. ¶ 10. Murphy goes on to state "with a high degree of scientific certainly that false crawls are harmful both to the energy reserves of the female sea turtles and to their reproductive productivity" in general. Id. ¶ 10. Even assuming, as the DHEC final report states, that the false crawls do not necessarily lead to a decrease in the total number of sea

---

[7] On this particular point of whether the sea walls are leading to sea turtles nesting in areas with little chance for successful hatching, Murphy and the DHEC final report are in agreement. The DHEC final report states that it is "debate[able]" whether the sea turtle "would not have laid her eggs regardless of the presence of the [sea walls], or if the [sea walls] interrupted a nesting attempt," but ultimately concedes that on sections of the beach contained sea walls, "[DHEC] has photographic evidence of sea turtle nesting in less than optimal areas, including at the base of erosional scarps." ECF No. 16, Ex. G, Final DHEC Wave Dissipation System Report at 22.

turtle nests on areas of the beach around sea walls, if the increased incidence of false crawls is lowering the reproductive potential of female sea turtles, then the court is convinced that plaintiffs have met their burden that the sea walls lead to a "significant impairment" in the sea turtles' breeding patterns. This is enough to find that there has been a "take" under the ESA. Plaintiffs have established this first factor.

### 2. Irreparable Harm

In the next element of the preliminary injunction analysis, plaintiffs must make a clear showing they will be irreparably harmed in the absence of preliminary injunctive relief. See Winter, 555 U.S. at 20. Generally, courts have found that there is a strong showing of irreparable injury in cases involving the ESA. See Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv., 789 F.3d 1075, 1091 (9th Cir. 2015) ("In light of the stated purposes of the ESA in conserving endangered and threatened species and the ecosystems that support them, establishing irreparable injury should not be an onerous task for plaintiffs."), cert. denied, 137 S. Ct. 293 (2016). That being said, courts are not mechanically obligated to grant an injunction for every violation of the ESA. Tennessee Valley Authority, 437 U.S. at 173.

On June 8, 2017, the DHEC Board authorized the sea walls for an additional year. ECF No. 20, Ex. C, June 8, 2017 DHEC Board Decision. Plaintiffs have made a strong case that, should the sea walls remain, the sea turtles will return to the same beaches with sea walls to nest, and that the false crawls will continue. See ECF No. 16, Ex. I, Murphy Declaration ¶ 17 ( "I can say to a high degree of scientific certainly that the [sea walls] are likely to cause additional false crawls going forward, both in this nesting season and in future nesting seasons."). DHEC argues that after the DHEC Board's most recent

reauthorization of the sea walls, the sea walls are now being maintained in a way that does not negatively impact sea turtle nesting. In support of this proposition, DHEC discusses an incident that occurred on June 21, 2017, when DHEC was notified of the existence of a sea turtle nest behind a section of a sea wall on Harbor Island. After being notified of the nest location, DHEC directed the Citadel, which is managing the pilot study of the sea walls, to remove the horizontal panels of the sea wall so that the sea turtle hatchlings could reach the ocean. ECF No. 20 at 4. DHEC presents no evidence that it has been monitoring the location of every sea turtle nest or that it has moved the horizontal panels of the sea walls for each of those sea turtle nests that are located behind the sea wall.

However, as described above in section III.C.2, the plaintiffs point to the incidence rate of the false crawls themselves as a "substantial impairment" to the sea turtle's breeding habits, citing the decreased fertility in female sea turtles as a result of the false crawls. Therefore, even if DHEC were able to locate every sea turtle nest that is located behind a sea wall and direct the Citadel to remove the horizontal panels of the sea wall—a proposition the court finds doubtful—what is leading to a "substantial interference" with sea turtle breeding patterns is the incidence rate of false crawls on those areas of the beach that contain sea walls. If anything, given that the DHEC Board has now authorized the sea walls for an additional year, DHEC's discussion of the June 21, 2017 incident highlights just how likely it is that the false crawls—and thus the "take" under the ESA—will continue unless the sea walls are taken down. The court is satisfied that plaintiffs have established a likelihood of irreparable harm by proving that future similar takings will continue if the status quo is maintained.

### 3. Balance of Equities

Next, plaintiffs must make a clear showing that the balance of the equities tips in their favor. In considering the balance of the equities between the parties, traditionally the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the relief requested." Winter, 555 U.S. at 24 (quoting Amoco Prod. Co. v. Village of Gambell, 480 U.S. 531, 542 (1987)).

DHEC argues that studies are "ongoing" to determine if the sea walls are serving their intended purpose of addressing coastal erosion. Based on DHEC's own reports, the court is skeptical that the sea walls are very effective at addressing erosion. For example, due to a "landward movement" of the scarp line, which refers to the slope on the beach due to wave action, homeowners at all of the sites where sea walls were installed requested emergency orders for sandbags to stabilize the area on multiple occasions. ECF No. 16, Ex. B, DHEC Staff Recommendation. Additionally, the sea walls led to "persistent scour," or local trenching at all sites, and it was only after the panels were removed that the beach profile was restored. Id. Finally, the sea walls "blocked the natural movement of sand up the beach," leading to a decrease in the sand volume on the landward side of the sea walls. Id. The final conclusions from DHEC staff were that: (1) the sea walls "do not address an erosional issue"; (2) the sea walls have "negative impacts to fauna, flora, physical or aesthetic resources, beach access and adjacent properties"; (3) the sea walls "do not satisfy all the criteria of the Budget Proviso." Id. Indeed, the final recommendation of DHEC staff to the DHEC board was that the sea walls not be approved for continued use and that the existing sea walls be removed from

18

the beach.  Id.  On the other side of this scale is the Congressional intent that endangered

species "be afforded the highest of priorities."  TVA, 437 U.S. at 174.

If these sea walls remain, endangered sea turtles will continue to false crawl.  In

the balance between sea walls—that are by their very design temporary—and the ESA,

which was enacted "not merely to forestall the extinction of species [] but to allow a

species to recover to the point where it may be delisted," Gifford Pinchot Task Force v.

United States FWS, 378 F.3d 1059, 1070 (9th Cir. 2004) (emphasis added), the ESA

prevails.  The court finds that plaintiffs have established this factor.[8]

### 4. Public Interest

Finally, plaintiffs must make a clear showing that an injunction is in the public

interest.  The Supreme Court has admonished that "courts of equity should pay particular

regard for the public consequences in employing the extraordinary remedy of an

injunction."  Winter, 555 U.S. at 24.  The court finds that plaintiffs have proven that it is

in the public interest for sea turtles to be able to nest, especially given the unique confines

on preliminary injunctions in ESA actions. Just last year, another court within this circuit

held that "[t]he equitable scales are always tipped in favor of the endangered or

threatened species, and the balance of hardships and the public interest tips heavily in

---

[8] In analyzing the balance of equities factor, the court also finds it persuasive that during the hearing, DHEC stated that: (1) under the budget proviso the sea walls were designed to be removed within 72 hours; (2) the sea walls would take approximately 120 hours to remove; and (3) if needed could be reinstated in 120 hours.  It does not appear to the court that it is a particularly arduous task for DHEC to remove temporary structures that were designed to be removed within 120 hours, so that the sea turtles may lay their nests before the end of this year's nesting season.  The sea walls were designated by the South Carolina General Assembly to be research structures and authorized by DHEC for a one-year period.  Certainly, it cannot be unforeseen that the sea walls would need to be removed after the research study ended.

favor of protected species." Red Wolf Coal v. United States Fish & Wildlife Serv., 210 F. Supp. 3d 796, 806 (E.D.N.C. 2016) (emphasis added) (internal quotations and citations omitted).

Having determined that plaintiffs have proven each of the four Winter factors, the court finds that the plaintiffs are entitled to preliminary injunctive relief. Accordingly, it orders the immediate removal of all sea walls from Harbor Island and Isle of Palms, and orders that these temporary sea walls remain removed during the sea turtle nesting period while this actions proceeds.

## IV.  CONCLUSION

For the foregoing reasons, the court **DENIES** DHEC's motion to dismiss and **GRANTS** plaintiffs' motion for a preliminary injunction.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**August 14, 2017**
**Charleston, South Carolina**